UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

_____

In re

ART UNLIMITED,

          Debtor.
_____

NEIL McKLOSKEY, TRUSTEE,

          Plaintiff,

v.

GALVA FOUNDRY CO., INC.,
WALTER L. NOCITO, and
WELLS FARGO BANK WISCONSIN, NA
f/k/a NORWEST BANK WISCONSIN, NA,

          Defendants.

Case No. 02-23992

Chapter 7

Adversary No. 04-2098

_____

MEMORANDUM DECISION ON DEFENDANT WELLS FARGO BANK WISCONSIN,
NA'S MOTION FOR SUMMARY JUDGMENT
_____

The chapter 7 trustee filed an adversary proceeding under 11 U.S.C. § 548(a)(1) seeking to recover payments made to Wells Fargo Bank Wisconsin, NA, after a portion of the debtor's assets were sold prepetition. Wells Fargo moved for summary judgment, the parties submitted numerous deposition transcripts, affidavits and briefs.

This court has jurisdiction under 28 U.S.C. § 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(H). This decision constitutes the court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052. For the reasons stated below, the motion is granted in part and denied in part.

BACKGROUND

Although the underlying facts are generally not disputed, the parties have dramatically different interpretations of the relevant transactions. The court has gleaned the following facts from the voluminous submissions of the parties.

The debtor, Art Unlimited LLC (AU), manufactured sports apparel bearing various decorative logos, but its business history has not been pretty. On May 1, 1996, Tom Butterbrodt, Dan Butterbrodt and Walter Nocito formed the LLC, which acquired a 75% interest in the assets of a partnership owned by Dwight Loveland and Robert Genisot. According to Nocito, the new business was experiencing cash problems in November 1996. In March 1997, the Butterbrodts and Nocito transferred their interests in the LLC to Galva Foundry Company, formerly an operating entity but then a shell holding company, of which they were the 100% owners. Apparently, Robert Genisot maintained his 25% interest in AU. He is not a party to this litigation.

In November 2000, Nocito and the other members recapitalized AU through a series of agreements whereby approximately $750,000 of cash was infused into the company and approximately $2.7 million of its debt was forgiven by the principals. When Wells Fargo provided the replacement financing, the prior lender, M&I Bank, also ended up writing off $1 million. Both the Butterbrodts and Nocito guaranteed the Wells Fargo debt. The Butterbrodts then became disenchanted with the business and an open hostility developed between them and Nocito. The Butterbrodts exited the business after forgiving all debt and paying the bank $750,000 in cash on their guarantees. As required by the recapitalization, Nocito also forgave all indebtedness owed to him by AU. The recapitalization left Galva Foundry Company as 87.5%

owner of AU, with the balance being owned by Robert Ginsot.

As a result of the recapitalization, Wells Fargo calculated that AU would have positive net worth of more than $3.2 million.  Nocito also believed that AU had a positive equity after the recapitalization even though, according to the Recapitalization Agreement, AU had no value at the time of recapitalization.  Recapitalization Agreement dated November 1, 2000, ¶ 1.6.  AU's assets secured the debt to Wells Fargo, and the payment was guaranteed by Nocito, up to $1.15 million.  AU's trade payables approximated $800,000.  Nocito borrowed money personally and executed a separate note in the amount of $950,000.  This note was secured by marketable securities owned by Nocito personally and valued between $1.2 million and $1.3 million.

In the recapitalization agreement, AU's officers acknowledge they had actively sought to find a buyer for the business for several years but could find no entity or person willing to pay enough to pay off the outstanding indebtedness.  They further admitted that they would all have to contribute some or possibly all of the amount guaranteed to cover the bank debt. Recapitalization Agreement dated November 1, 2000, ¶ 1.5.

According to Stephen Wald, the president of Naturally Knits, a long time supplier of the debtor and substantial creditor, the business always suffered problems and was dysfunctional from its inception.  After the November 2000 recapitalization in which the Butterbrodts exited the business after forgiving all debt and paying the bank $750,000 in cash on their guarantees, things barely changed.  Wald was getting financial reports from the company as a key trade creditor, and these showed no improvement in the business operations.  Wald indicated that the public accounting firm, Grant Thornton, could not close the books for the year 2000 and was generally at odds with Nocito over a "going concern" qualification.  Wald, who had been in the

fabric business since 1975, was of the opinion that inventories of AU were perpetually carried at cost even though they were dated and were probably worth only a percentage of what they were carried on the books by AU.

Although Nocito had forgiven the obligations owed to him by AU, he was not relieved of the obligation to Wells Fargo for approximately $1.1 million which he had borrowed personally at various times and lent to the debtor. He had guaranteed all of the obligations of the debtor to Wells Fargo up to $1.15 million, and the guarantee was collateralized by any and all collateral, i.e., AU's assets and his personal securities held by the bank.

By February 2001, AU was out of compliance with its borrowing base obligations (credit line of $721,000) and the parties entered into a forbearance agreement. As part of the forbearance agreement, Wells Fargo required financial statements from AU and daily borrowing base certificates.

AU decided to liquidate some of its assets in an effort to pay down its debt to Wells Fargo. At the end of March and in the first few days in April 2001, negotiations took place between Nocito and Steve Scharpf, owner of Art Unlimited Sportswear, LLC, (AUS) for the purchase of assets. Phil Neary, the loan officer at Wells Fargo responsible for the AU loan, and Wells Fargo's attorney were also involved in the negotiations. AU voluntarily surrendered certain assets to Wells Fargo and entered into a sales transaction with AUS for other assets, primarily real estate, leases, samples, and work in process. The assets surrendered to Wells Fargo, including finished goods and other collateral, were conveyed to AUS.

According to Scharpf, just prior to closing, Nocito insisted that he be paid a substantial portion of the purchase price by way of a "consulting agreement." The amount to be paid was

4

Case 04-02098-mdm    Doc 27    Filed 10/19/05    Page 4 of 16

$600,000 at closing, plus a percentage of future sales of products purchased from AU. Scharpf did not care how the transaction was structured, as long as it did not affect the total amount he was spending. He knew that Wells Fargo would be receiving the amount due under the consulting agreement in any event. It is not clear what Wells Fargo's participation in the structure of the transaction was, but they clearly knew they would be receiving, one way or another, all of the funds from the transaction, plus the additional funds from a loan by Associated Bank to Galva, which they required for a simultaneous forbearance agreement.

At the closing Scharpf paid $1.5 million of the approximately $3 million purchase price in cash and executed a series of notes evidencing a commitment to purchase inventory, if needed, in the future. AU retained its accounts receivable, payable to a Wells Fargo lockbox, and certain inventory which was to be liquidated later after the business closed. Wells Fargo received the $600,000 consulting fee from Galva, plus another $500,000 borrowed by Galva from Associated Bank[1] and paid to Wells Fargo. Wells Fargo applied the funds to Nocito's personal notes, which were then canceled, and to AU's obligations. Nocito indicated in his deposition that Wells Fargo, after the fact, asked for a written direction from Galva signed by Nocito authorizing the draft of the Galva account to pay Nocito's obligation.

According to Nocito's deposition, the bank's officer, Phil Neary, was aware of the consulting agreement and had a copy. Nocito's attorney expressed concern about the consulting agreement being a fraudulent conveyance at the time of the closing in front of the bank officer and the bank's attorney. Scharpf did not expect any consulting services and indicated that neither

---

[1] With respect to the loan from Associated Bank, Wells Fargo agreed to subordinate its interest in the first $500,000 of the marketable securities pledged by Nocito, as was demanded by Associated Bank to make the loan to Galva.

5

Galva nor Nocito provided any services under the agreement. According to Wald, the relationship between Nocito and Scharpf had deteriorated to such a point that any consulting arrangement would have been impossible. Indeed, Scharpf acknowledged that he considered Nocito a competitor as Nocito was also selling some of the same garments as AUS.

The April 9, 2001, transactions also included an Amended Forbearance Agreement in which Wells Fargo agreed to forebear from taking further action against AU until July 15, 2001, in order to give AU additional time to liquidate its remaining assets and wind down its on-going business. During that period, AU agreed to continue its operations, to incur only liabilities it could pay, and to provide a budget and weekly reports to Wells Fargo. In consideration for the Forbearance Agreement, AU and Nocito agreed to make a lump sum payment to Wells Fargo in the amount of $1.1 million for satisfaction of Nocito's Note and thereafter, for application to the AU Note guaranteed by Nocito. The $1.1 million came from Galva from the $600,000 consulting agreement payment and the $500,000 proceeds from Galva's loan from Associated bank.[2]

According to Wells Fargo's interpretation of events, the consulting agreement was an independent transaction between AUS, the purchaser of AU's assets, and Galva, the parent company of AU. The agreement provided that Nocito, as the 100% owner of Galva, would provide consulting services for the two year transition period following the sale. Nocito could have entered into the agreement individually; however, he chose to execute the agreement under

---

[2]The trustee in his brief refers to the $1.1 million payment from Galva as being proceeds of the consulting agreement paid for at the time of the transaction. Since the consulting agreement clearly states that payment is only $600,000, and other documents submitted by Wells Fargo refer to the loan to Galva, which the trustee does not dispute, this appears to be a mistake in referring to what Wells Fargo received rather than a disputed fact.

6

Galva to take advantage of the latter's tax loss carry forwards.

According to Stephen Wald, the trade creditor of AU who participated to some extent in negotiations for the sale of the business, Nocito confided in him that he wanted to liberate the securities he had pledged to the bank on his personal note. As facilitator of the transaction, Wald believed he was going to be paid his trade debt by both Nocito and Scharpf. Because relations between Nocito and Scharpf had deteriorated during the course of negotiations, by the time of closing, Wald had become convinced that creditors other than Wells Fargo and Nocito would receive nothing from the transactions. Also, at the time of the closing, both Scharpf and Nocito stated to Wald that they had no intention of paying off trade creditors. Although he was involved in the early phases of the negotiations, Wald only found out about the consulting agreement during discovery proceedings in this action.

Both Nocito and Wells Fargo officers assert that they believed that the liquidation of its assets would be more than enough to pay all the creditors, making AU a solvent entity. Just weeks prior to the closing, Nocito provided Wells Fargo with an estimate of expected revenue from the sale of collateral resulting in possible "excess cash" of $1.15 million. Wells Fargo also asserts AU's solvency as of April 9, 2001, as opined by Wells Fargo's expert, Tracy Coenen. Her opinion is that following the transactions, AU had a balance sheet equity of at least $1,156,184, and as much as $1,692,682.

Following the transactions, AU continued to liquidate its inventory and, due to the continued deterioration of the relationship between Scharpf and Nocito, AUS ultimately declined to purchase additional inventory from AU. The conduct of the bank in connection with the liquidation of inventory is the subject of another adversary proceeding. AU filed for chapter 7

7

bankruptcy relief on April 5, 2002.

At issue in this case is the payment made by AUS to Galva, which Galva delivered to Wells Fargo (or Wells Fargo took by sweeping Galva's account) for application against Nocito's personal obligation to Wells Fargo.

ARGUMENTS

Wells Fargo argues the trustee's claims are based on several faulty assumptions: the first is that AU was insolvent on April 9, 2001, or was rendered insolvent by its transactions on that date; the second is that AU had an interest in the monies transferred to Wells Fargo by Galva; and the third is that the parties intended to defraud other creditors. According to Wells Fargo, the facts of the case support dismissal of the trustee's claims. Moreover, a review of the entire transaction shows that, even if the transactions were avoided and the monies were distributed as proposed by the trustee, the security position of Wells Fargo would result in a distribution that would be the same, with nothing available for payment to unsecured creditors. Because the end result would not change, Wells Fargo asserts continuing this lawsuit would be an exercise in futility.

The trustee contends the transfer to Galva Foundry for a "consulting agreement" that required no rendering of services, which funds were subsequently transferred to Wells Fargo to satisfy Nocito's personal obligation, was for no consideration and was done with the actual intent to hinder, delay or defraud the creditors of the debtor. In effect, Nocito was paid on his "equity" position ahead of the claims of trade creditors. Alternatively, the debtor received less than reasonably equivalent value in exchange for the transfer to Galva Foundry, and AU was insolvent on the date of the transfer or was made insolvent as a result of the transfer.

8

# DISCUSSION

Bankruptcy Rule 7056(c) provides that summary judgment should be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The first two causes of action in the trustee's complaint are brought under 11 U.S.C. § 548(a)(1), which provides in relevant part:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

11 U.S.C. § 548(a)(1). The first cause of action in the trustee's complaint is pursuant to section 548(a)(1)(A) and is referred to as "actual fraud" because of the element of the debtor's actual intention to hinder, delay or defraud creditors.

Badges of fraud, the existence of which can be used to infer actual intent to defraud, include: absconding with the proceeds of the transfer immediately after their receipt; absence of consideration when the transferor and transferee know that outstanding creditors will not be paid; huge disparity in value between the property transferred and the consideration received; fact that

9

the transferee was an officer, or agent or creditor of an officer of corporate transferor; insolvency of the debtor; and existence of a special relationship between the debtor and the transferee. *In re FBN Food Servs., Inc.*, 185 B.R. 265, 275 (N.D. Ill. 1995); *see also In re Frierdich*, 294 F. 3d 864, 870 (7th Cir. 2002) (other "badges" include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became insolvent at the time of the transfer).

The trustee notes that the existence of fraud can be inferred from the acts and conduct of the interested parties and culpability on the part of the transferee is not essential. According to the trustee, the transfer of $1.1 million of proceeds (actually $600,000, described above) at the closing to Galva for a "consulting agreement" that required no services to be rendered, which funds were subsequently transferred to Wells Fargo to satisfy Nocito's personal obligation was for no consideration and was done with actual intent to hinder, delay or defraud the creditors of the debtor.

Wells Fargo is correct that AU had no interest in the $500,000 that Associated Bank loaned to Galva, which in turn paid the proceeds to Wells Fargo to pay down Nocito's personal obligation. Wells Fargo obviously knew about this loan because it subordinated its interest in the first $500,000 in marketable securities to secure the loan. However, the money never came from the debtor, nor was it traceable to any consideration provided by the debtor. Galva is a separate

10

entity and was not indebted to Wells Fargo when it paid down the loan of its principal. The consideration for the payment was the forbearance of Wells Fargo with respect to the debtor's remaining obligations; the debtor's obligations to Wells Fargo may not have been reduced by this payment, but it did benefit by staying in business a little longer. Wells Fargo is entitled to summary judgment as to this $500,000 payment from Galva.

The actual intent to hinder, delay, or defraud by Wells Fargo relating to the $600,000 "consulting agreement" is more problematic. There is an issue of fact as to whether the bank was complicit in diverting funds to the benefit of Nocito personally to the detriment of other creditors. This is an issue of material fact that must be fleshed out at trial. The deposition and documentary evidence shows that the bank was heavily involved in, and in fact facilitated, Galva's ability to obtain the loan required to obtain sufficient funds to support AU's forbearance agreement. The consulting agreement was an integral part of this portion of the transaction. Both Wald and Neary are alleged to have assisted in the negotiations, and Wald testified that Scharpf and Nocito did not contemplate that any consulting would take place, and did not think the trade creditors would get anything, notwithstanding claims of financial health, and Nocito was trying to free up his personal assets. It is a logical inference that Neary might have similar knowledge and assisted in this goal, making this an issue for trial. The bank's motion for summary judgment with respect to the $600,000 payment pursuant to the consulting agreement is denied.

The second cause of action in the trustee's complaint is brought under section 548(a)(1)(B), which is often called "constructive fraud" because it omits any element of intent. The trustee must establish that the debtor received less than a reasonably equivalent value in

11

exchange for such transfer or obligation and was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

The factors used to determine reasonably equivalent value are (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997).

The trustee claims there is no question that the debtor received less than a reasonably equivalent value in exchange for the transfer of $1.1 million (again, only $600,000 according to the undisputed document) to Galva/Nocito. This appears to be true. However, for the issue of constructive fraud to go forward, there must be a material issue as to the solvency of AU at the time of the transaction.

Wells Fargo argues its expert accountant's recreation of the balance sheet shows that AU was solvent on the transaction date and the trustee has not challenged that conclusion. On the other hand, the trustee points out that the liquidation of assets in the six months following the transaction date did not pay the bank's secured debt in full, leading to the conclusion that the value of the inventory on the debtor's books was grossly overstated.

To determine solvency, a simple balance sheet approach is utilized. *See* 11 U.S.C. § 101(32). Nevertheless, as noted by the Seventh Circuit, "[a]ccountants may value assets at cost ("book value"), but if the market value of a firm's assets exceeds its liabilities, it is solvent notwithstanding red ink in the balance sheet. The reverse is true as well: a firm whose assets are worth less than book value may be insolvent despite a financial statement showing positive net

worth. Market value of both assets and liabilities determines solvency." *Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 660 (7th Cir. 1992). Additionally, expert testimony is not necessarily required to prove insolvency. *See In re Consolidated Indus. Corp.*, 292 B.R. 354, 360 (N.D. Ind. 2002).

In essence, the bank argues that it has a CPA's affidavit and the trustee does not; therefore, it is entitled to summary judgment that the debtor was solvent. Would that the issue were that simple. True, Ms. Coenen's affidavit in paragraphs 3 and 4, consisting of four lines of type, states that she reconstructed the books, and the debtor was solvent at the time of the transaction. There is an attached balance sheet. However, the weight of an expert's opinion, and the logic of her analysis, are for the court to decide. While the trustee must come up with sufficient allegations as to the debtor's insolvency, other than the fact that it was forced to liquidate after the transaction, the depositions submitted are adequate to put the debtor's financial condition at issue. For example, Mr. Wald, while not an accountant, does have experience in a related industry, and he stated cost was an inappropriate asset value. Also, his testimony with respect to Nocito's opinion as to what trade creditors might receive is telling with respect to the value of the company in April 2001. Insolvency of the company at the time of the $600,000 transfer is an issue for trial, and summary judgment on that issue is denied.

Wells Fargo further contends that even if the money from Galva had been applied to AU's debts, Wells Fargo would have ultimately liquidated the cross-collateralized marketable securities to satisfy Nocito's debt. Under this scenario, Wells Fargo would have been left with the same deficiency and the unsecured creditors would have received nothing. Continuing this lawsuit when it would have no practical effect on the bankruptcy estate is arguably a waste of

time and resources for all parties. The trustee obviously believes otherwise. The bank's argument goes to damages, not liability, and it may be correct. However, since the value of the company cannot be determined as a matter of law, neither can damages. This also remains an issue for trial.

The third cause of action in the complaint alleged a voidable preferential transfer to an insider under section 547(b)(4)(B). The trustee also seeks recovery of the avoided transfer under section 550, which provides, in part, that he may recover "the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a)(1).

In *V.N. Deprizio Constr. Co. v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1194-95 (7th Cir. 1989), the Seventh Circuit held that the trustee was permitted, under sections 547(b) and 550 to avoid transfers made to outside creditors between 90 days and one year before the filing of the bankruptcy petition where the transfers were made for the benefit of insiders who had guaranteed the debtors' obligations. The court reached this result by literally reading section 550(a)(1) so as to enable the trustee to recover from "the initial transferee" (the noninsider) although "the entity for whose benefit such transfer was made" (the insider guarantor) is the truly culpable party. The *Deprizio* analysis begins with section 547(b), which defines those transfers that are avoidable. *Id*. at 1194. Transfers benefitting inside creditors are subject to the extended preference period of section 547(b)(4)(B). Under the ruling in *Deprizio*, once it is determined that the elements of section 547(b) are satisfied, the unambiguous language of section 550(a) then identifies the party responsible for repayment of the preference. *Id*. Section 550(a), unlike section 547(b), makes no distinction between insiders and outsiders; recovery may be obtained from either the initial transferee (the outside creditor) or the entity for whose benefit the transfer was made (the inside

14

creditor). *Id*.

Where recovery is sought from the initial transferee of property, the defense under section 548(c) is available:

> (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c). As an affirmative defense, the elements must be proven by the transferee.

Wells Fargo claims it is not liable to return the monies transferred by Galva because Wells Fargo was a subsequent transferee that accepted the monies in good faith without knowledge of the avoidability of the transfer and applied the monies to antecedent debt. The trustee argues he may recover an avoided transfer from the initial transferee or the entity for whose benefit such transfer was made or any immediate or mediate transferee of the initial transferee. The fact that the payment was made through Galva is not significant, as Galva was a mere conduit of the transfer. Additionally, the trustee argues that Wells Fargo may not avail itself of the protection of section 548(c) because no value was given to the debtor and the bank lacked good faith. Given the bank's alleged participation in negotiation and execution of the $600,000 transfer pursuant to the consulting agreement, supported by documents and deposition testimony, the bank's knowledge and good faith are an issue for trial. The bank's motion for summary judgment with respect to the alleged preference is denied.

## CONCLUSION

For the reasons discussed above, Wells Fargo's motion for summary judgment is granted

with respect to the $500,000 transfer from Galva Foundry is granted.  In all other respects, the motion is denied.  A separate order will be entered.

October 12, 2005

                                      Margaret Dee. McGarity
                                      U.S. Bankruptcy Judge