UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re

ART UNLIMITED, LLC,

        Debtor.

Case No. 02-23992

Chapter 7

NEIL McKLOSKEY, TRUSTEE,

        Plaintiff,

v.

GALVA FOUNDRY CO., INC.,
WALTER L. NOCITO, and
WELLS FARGO BANK WISCONSIN, NA
f/k/a NORWEST BANK WISCONSIN, NA,

        Defendants.

Adversary No. 04-2098

---

MEMORANDUM DECISION

---

This is a fraudulent transfer action brought by the chapter 7 trustee against various parties to a complicated sale transaction involving most, but not all, of the debtor's assets before the bankruptcy case was filed. The court dealt with a portion of the transaction on a motion for summary judgment brought by defendant Wells Fargo Bank Wisconsin, NA, (*see* Memorandum Decision and Order dated October 12, 2005) and deferred the remaining issues for trial. The trial was held over three days on September 6 through 8, 2006, and the parties filed post-trial briefs. This court has jurisdiction under 28 U.S.C. § 1334(b), and this is a core proceeding under 28 U.S.C. § 157(b)(2)(H). This memorandum decision represents the court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## BACKGROUND

Many of the facts described below came out of the undisputed facts set forth in this court's decision on summary judgment. They are supplemented by evidence presented at trial.

The debtor, Art Unlimited, LLC (AU), manufactured artistically decorated (as opposed to team oriented) sports apparel, such as tee shirts, sweatshirts, and fleece items. On May 1, 1996, Tom Butterbrodt, Dan Butterbrodt and Walter Nocito formed the limited liability company that became the debtor for the purpose of operating AU's business. The LLC acquired a 75% interest in the assets of a partnership owned by Dwight Loveland and Robert Genisot, which had been manufacturing the debtor's brand of apparel. Mr. Genisot remained active in the business.

According to Mr. Nocito, the newly acquired business was experiencing cash problems in November 1996. In March 1997, the Butterbrodts and Mr. Nocito transferred their interests in the LLC to Galva Foundry Company, formerly an operating entity but then a shell holding company. Each was a one-third owner of Galva Foundry. Robert Genisot maintained his 25% interest in AU. He is not a party to this litigation.

In November 2000, Mr. Nocito and the other members recapitalized AU through a series of agreements whereby approximately $750,000 of cash was infused into the company and approximately $2.7 million of its debt was forgiven by the principals. When Wells Fargo provided the replacement financing, the prior lender, M&I Bank, also ended up writing off about $1 million. Both the Butterbrodts and Mr. Nocito guaranteed the Wells Fargo debt.

As a result of the recapitalization, Wells Fargo calculated that AU would have positive net worth of more than $3.2 million. Mr. Nocito testified he also believed that AU had a positive equity after the recapitalization, even though the Recapitalization Agreement stated AU had no

2

value at that time. (Ex. # 3, Recapitalization Agreement dated November 1, 2000, ¶ 1.6) AU's assets secured the debt to Wells Fargo, and AU's debt was guaranteed by Mr. Nocito, up to $1.15 million.[1] AU's trade payables approximated $800,000 at the time. Mr. Nocito borrowed money personally from Wells Fargo and executed a separate note in the amount of $950,000. This note was secured by marketable securities owned by Mr. Nocito personally and valued in November of 2000 between $1.2 million and $1.3 million. However, they were worth considerably less when liquidated (approximately $920,000, according to Mr. Nocito's counsel's brief) and applied to the AU debt the following year.

In the Recapitalization Agreement, AU's officers acknowledged they had actively sought to find a buyer for the business for several years but could find no entity or person willing to pay enough to pay off the outstanding indebtedness. They further admitted that they would all have to contribute some or possibly all of the amount guaranteed to cover the bank debt. (Ex. # 3, Recapitalization Agreement dated November 1, 2000, ¶ 1.5)

Shortly thereafter, the Butterbrodts became disenchanted with the business and an open hostility developed between them and Mr. Nocito. The Butterbrodts exited the business and paid the bank $750,000 in cash on their guarantees, which were released. The recapitalization left Galva Foundry Company as 87.5% owner of AU, with the balance being owned by Robert Ginsot. Apparently, Walter Nocito became the sole owner of Galva.

According to Stephen Wald, the president of Naturally Knits, a long time supplier of the debtor and substantial creditor, the business always suffered problems and was dysfunctional from its inception. After the November 2000 recapitalization in which the Butterbrodts exited

---

[1]The guarantee became unlimited when the assets were sold.

the business, forgiving all debt and paying the bank $750,000 in cash on their guarantees, problems with paying creditors continued. Mr. Wald was getting financial reports from the company as a key trade creditor, and these showed no improvement in the business operations. He believed the public accounting firm, Grant Thornton, could not close the books for the year 2000 and was generally at odds with Mr. Nocito over a "going concern" qualification. Mr. Wald, who had been in the fabric business since 1975, was of the opinion that inventories of AU were perpetually carried at cost even though they were dated and were probably worth only a small percentage of what they were carried on the books by AU. He described this accounting method as the FISH method: First In, Still Here. He also testified that a substantial write down was in order, not only because of the age of the inventory, but because older inventory was poorly stored in an inadequate facility. He considered about 85% of the inventory, "junk."

Although Mr. Nocito had forgiven the obligations owed to him by AU, he was not relieved of the obligation to Wells Fargo, which had grown to approximately $1.1 million, and which he had borrowed personally at various times and lent to the debtor. He had also guaranteed all of the obligations of the debtor to Wells Fargo, and the guarantee was collateralized by any and all collateral, i.e., AU's assets and his personal securities held by the bank.

By February 2001, AU was out of compliance with its borrowing base obligations (credit line of $721,000) and the parties entered into a forbearance agreement. As part of the forbearance agreement, Wells Fargo required financial statements from AU and daily borrowing base certificates.

Mr. Nocito decided that AU should liquidate some of its assets in an effort to pay down

4

its debt to Wells Fargo. At the end of March and in the first few days in April 2001, negotiations took place between Mr. Nocito and Steve Scharpf, who had formed and owned with his wife Art Unlimited Sportswear, LLC, (AUS) for the purchase of assets. Phil Neary, the loan officer at Wells Fargo responsible for the AU loan, and Wells Fargo's attorney were kept apprised of the negotiations and attended at least some of the negotiation meetings. Eventually, a transaction was structured for AU to voluntarily surrender certain assets selected by Mr. Scharpf to Wells Fargo. The bank then entered into a sales transaction with AUS for these assets, primarily real estate, leases, samples, raw materials, work in process, finished goods and other collateral.

According to Mr. Scharpf, just prior to closing, Mr. Nocito insisted that he be paid a substantial portion of the purchase price by way of a "Consulting Agreement." (Group Ex. # 11, Ex. # 111) The amount to be paid for this part of the transaction was $600,000 at closing, plus a percentage of future sales. Mr. Scharpf did not care how the transaction was structured, as long as it did not affect the total amount he was spending. He knew that Wells Fargo would be receiving the $600,000 due under the "Consulting Agreement" at closing. Wells Fargo's attorney testified he had no objection to the structure of the transaction for the same reason. The bank would be receiving, one way or another, all of the funds from the transaction, plus the additional funds from a $500,000 loan by Associated Bank to Galva, which Wells Fargo required for a simultaneous forbearance agreement. Funneling the funds paid for the "Consulting Agreement" through Galva made economic sense in that it allowed use of a substantial tax benefit due to the operating loss carryovers of that company, rather than having Mr. Nocito declare the entire amount as earned income.

The "Consulting Agreement" also provided that 2.5% of net sales, defined in the

agreement, would be paid to Galva for two years, up to an additional $600,000. Apparently, AUS paid either $245,000 on this obligation (Wells Fargo brief and Mr. Scharpf's testimony), or $224,000 (Trustee brief), and the proceeds went to Associated Bank to satisfy Galva's obligation. The court accepts the $245,000 figure as those two parties are in a better position to know how much was paid on this portion of the obligation. Wells Fargo did not receive these funds directly, but reduction of the Associated Bank loan to Galva freed up Mr. Nocito's securities to satisfy his remaining obligations to Wells Fargo. The trustee believes these should have been part of the purchase price paid to the debtor for its assets but were diverted to Mr. Nocito's and Galva's personal obligations.

At the closing Mr. Scharpf and AUS paid approximately $1.5 million in cash and executed a series of notes for assets and made a commitment to purchase inventory from AU, if needed, in the future. AU retained its accounts receivable, payable to a Wells Fargo lockbox, and certain inventory which was to be liquidated later if not sold to AUS. The April 9, 2001, transactions also included an Amended Forbearance Agreement (Ex. # 8, Tab 14) in which Wells Fargo agreed to forebear from taking further action against AU until July 15, 2001, in order to give AU additional time to liquidate its remaining assets and wind down its ongoing business.

During that period, AU agreed to continue its operations, to incur only liabilities it could pay, and to provide a budget and weekly reports to Wells Fargo. In consideration for the Forbearance Agreement, AU and Mr. Nocito agreed to make a lump sum payment to Wells Fargo in the amount of $1.1 million for satisfaction of Mr. Nocito's personal note and thereafter, for application to the AU note guaranteed by Mr. Nocito. The $1.1 million came from Galva from the initial $600,000 "Consulting Agreement" payment and the $500,000 proceeds from Galva's

Case 04-02098-mdm    Doc 67    Filed 12/06/06    Page 6 of 21

loan from Associated Bank, both paid at the time of closing. After the fact, Mr. Neary asked for a written direction from Galva signed by Mr. Nocito authorizing the draft of the Galva account to pay Mr. Nocito's obligation. Mr. Nocito complied.

This court determined on Wells Fargo's previous motion for summary judgment that the $500,000 loan proceeds that Galva borrowed from Associated Bank and transferred to Wells Fargo to satisfy Mr. Nocito's personal loan was not a fraudulent transfer that the trustee could avoid because property of the debtor was not transferred. The $600,000 from the "Consulting Agreement," which went to Galva and then to Wells Fargo, remains at issue, and the trustee also wishes to recover other amounts paid under the percentage of sales portion of the agreement.

According to Mr. Nocito, the bank's officer, Mr. Neary, was aware of the "Consulting Agreement" and had a copy. Mr. Nocito's attorney expressed concern about the "Consulting Agreement" being a fraudulent conveyance at the time of the closing in front of the bank officer and the bank's attorney, or perhaps months later – parties do not agree. Mr. Scharpf did not expect any consulting services and indicated that neither Galva nor Mr. Nocito provided any services under the agreement. According to Steven Wald, the trade creditor of AU who participated to some extent in negotiations for the sale of the business, the relationship between Messers. Nocito and Scharpf had deteriorated to such a point that any consulting arrangement would have been impossible. When Mr. Wald tried to mediate the sale agreement, he had to put the two men in separate rooms because having them together had an incendiary effect.

After the sale, matters only got worse. Indeed, Mr. Scharpf acknowledged that he considered Mr. Nocito a competitor as Mr. Nocito was selling some of the same garments as AUS, sometimes to the same customers. This was probably true because Mr. Scharpf did not

7

purchase as much existing inventory as Mr. Nocito had hoped, nor as fast as he hoped. Mr. Scharpf took all current inventory and raw materials at the time of sale, leaving Mr. Nocito with about 153,000 garments to liquidate, all older merchandise.

According to Mr. Wald, Mr. Nocito admitted to him that he wanted to liberate the securities he had pledged to the bank on his personal note. As facilitator of the transaction, Mr. Wald originally thought he was going to be paid his AU trade debt. Just to be safe, however, he negotiated a mediation fee approximately equal to the amount AU owed his company for his part in the transfer, but he never received this either. Because relations between Messers. Nocito and Scharpf had deteriorated during the course of negotiations, by the time of closing, Mr.Wald had become convinced that creditors other than Wells Fargo and Mr. Nocito would receive nothing from the transactions. Although he was involved in the early phases of the negotiations, Mr. Wald only found out about the consulting agreement during discovery proceedings in this action.

After closing, AU continued to liquidate its inventory. Due to the continued deterioration of the relationship between the principals, AUS ultimately declined to purchase additional inventory from AU (an offer to pay 40% of cost for the remaining raw materials and inventory was rejected by Mr. Nocito) but it did pay the percent of profits required by the consulting agreement, assigned to Associated Bank by Galva, to complete payment of the purchase price. The liquidation of Mr. Nocito's securities was applied to AU's debt in accordance with his personal guarantee, leaving Wells Fargo about $400,000 short on the AU debt.

AU filed for chapter 7 bankruptcy relief on April 5, 2002.

### DISCUSSION

Because of the complexity of this sale and the routes traveled by the funds it generated, it

8

is helpful to collapse the transaction to its essence, i.e., (1) what was the value of what the debtor parted with, (2) who provided the consideration for the debtor's assets, and (3) who got the money for them? *See, e.g., In re Leneve*, 341 B.R. 53 (Bankr. S.D. Fla. 2006) (essential comparison in constructive fraudulent transfer inquiry is "what went out" with "what was received"). The analysis is also useful in determining whether actual fraud was committed.

The first question is relatively simple: Steve Scharpf and AUS paid cash or executed notes totaling $1,987,677.50 ("DEAL STRUCTURE," Ex. # 8, Tab 13), plus approximately $245,000 as a percentage of sales after closing. The court is satisfied that this total, $2,232,677.50, is the value of the assets the debtor parted with. Given how heavily the debtor had been marketed, how vigorously the deal was negotiated, and the fact that total proceeds were less than what Wells Fargo was owed, compels a finding that the total purchase price was equivalent to the value of the debtor's transferred assets. None of the consideration related to Mr. Nocito's services under the "Consulting Agreement"; more about that later. Galva provided $500,000, which it borrowed from Associated Bank, and the court has already decided this was not a transfer of the debtor's interest in property. This amount induced the bank to go along with the deal because it was to receive considerably less than the amount of its claim, but it was not part of the value of the debtor's property.

The second question, who paid, is also simple. Mr. Scharpf and AUS provided all consideration, except for $500,000, which was borrowed by Galva and secured with Mr. Nocito's personal securities, thanks to a subordination agreement by Wells Fargo to make the Galva loan happen.

Who got the money, which goes to the heart of the trustee's action, requires a more

9

circuitous answer. Amounts paid or notes executed that were allocated to hard assets, the $1,987,677.50, went to Wells Fargo at closing to reduce its secured claim against the debtor. This transfer is not challenged by the trustee because the debtor transferred its assets and the debtor got the money. The $500,000 from Galva that went toward Walter Nocito's personal notes did not come from the debtor, and the court has already denied recovery by the trustee on summary judgment. The remaining $600,000 allocated to the "Consulting Agreement" was for the debtor's assets and was paid by the buyer at closing but it went to Galva Foundry. Galva, acting as a shell and a conduit and pursuant to Mr. Nocito's instructions, immediately paid these funds to Wells Fargo to pay down the personal obligation of Walter Nocito. The debtor was *not* obligated on these notes, nor were its assets security for their payment. Therefore, Mr. Nocito got the $600,000. This is one of the two targets of the trustee's avoidance action.

Who received the $245,000 for a percentage of sales after closing is similarly circuitous. These funds went to Galva under the "Consulting Agreement." The Consulting Agreement was assigned by Galva to Associated Bank, and these payments went toward the $500,000 loan. This loan was also secured by Mr. Nocito's personal securities, and Wells Fargo had subordinated its interest in those securities to the extent necessary to facilitate the loan. As the Associated Bank loan was paid down, the personal securities were released. Again, this was part of the purchase price of the debtor's assets, but Galva got the money, which then traveled to Associated. This time, however, the released securities were used to pay down Mr. Nocito's guarantee on the AU debt. Simultaneously, the debtor's debt was reduced by the value of the securities released, so both the debtor *and* Mr. Nocito got the money.

10

*Standards for Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A).*

Section 548(a)(1)(a) in effect at the time of the debtor's filing provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the peititon, if the debtor voluntarily or involuntarily–

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made. . . .

11 U.S.C. § 548(a)(1)(A).

The trustee must prove by clear and convincing evidence that all elements of this section are met. *Frierdich v. Mottaz*, 294 F.3d 864 (7th Cir. 2002). It is undisputed the transfer occurred within a year of filing.

Mr. Nocito structured this deal. He controlled both the debtor and Galva. Neither the bank nor Mr. Scharpf wanted or needed a consulting agreement, and they had nothing to do with the value he assigned to it. The bank's summary of the deal includes this $600,000 in the value of the assets transferred. One purpose of the "Consulting Agreement" was to save personal income taxes, it cost Mr. Scharpf nothing, and did not reduce the proceeds going to the bank to pay down the indebtedness of one or both of its borrowers. No one believed there would actually be any consulting, let alone $600,000 worth, because of the hostile relationship of the parties, notwithstanding Mr. Nocito's averred availability, and neither does the court.

Mr. Nocito controlled the bank account to which the $600,000 was deposited. He instructed Mr. Neary to pay his personal note, and Mr. Neary had no choice but to do so. Mr. Neary believed there would be enough to pay unsecured creditors, *if* Mr. Nocito's sales went as anticipated and *if* Mr. Scharpf purchased a substantial amount of the remaining inventory (up to

11

$600,000 per the "Consulting Agreement," which would have paid off Associated Bank and released *all* of Mr. Nocito's personal securities), and perhaps Mr. Nocito believed this as well. The court is skeptical of Mr. Nocito's beliefs, however, given the age and condition of what he was trying to sell and what he actually did. Mr. Nocito made sure he received as much as possible as early as possible - *before* $800,000 to $1,000,000 in unsecured trade creditors received a dime. Not coincidentally, his personal notes just equaled the amount received from Galva, plus the advance for the "Consulting Agreement." Structuring the transaction to put his personal obligations ahead of the debtor's obligations to trade creditors is consistent with the testimony of Mr. Wald, who stated Mr. Nocito wanted only to liberate his securities, not to pay trade creditors. Mr. Nocito may have had no intention to defraud trade creditors, but the court finds he did intend to hinder and delay them. Furthermore, even though Galva was the initial transferee, Mr. Nocito was a subsequent transferee of the benefit of these funds. *See* 11 U.S.C. § 550(a)(2). Mr. Nocito was well aware he was acting to the detriment of trade creditors, he intended to do so, he did not act in good faith in structuring the transaction, and he did not provide value for the transfer from Galva; therefore, he is not entitled to the protections of 11 U.S.C. § 550(b) as a good faith transferee. The trustee has met his burden of proof by clear and convincing evidence and is entitled to judgment against Mr. Nocito for $600,000. Likewise, the actual intent to hinder and delay creditors is imputed to Galva Foundry Company, Inc., and the trustee is entitled to judgment against it.

Once his personal notes were paid, Mr. Nocito had to deal with guarantees that he or his securities were obligated to satisfy. The post-closing sales amount of $245,000 fall into this category. The payment was for the debtor's assets, and the proceeds went through Galva and

Associated Bank, but they released assets that reduced the debtor's indebtedness to Wells Fargo. Therefore, the debtor eventually received the benefit of these funds, and there was no fraudulent transfer as to Galva and Mr. Nocito.

*Standards for Avoidance of Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B).*

Even though the trustee is entitled to recover from Mr. Nocito, he also wishes to obtain judgment against Wells Fargo, which after all, received all the money. The court determined after trial that the bank, in the person of Mr. Neary, did not intend to defraud trade creditors, and he had reason to believe at the time of the transfer that circumstances could result in everyone being paid. Therefore, in order to prevail against the bank, the trustee must prevail under the theory of constructive fraud, 11 U.S.C. § 548(a)(1)(B). After eliminating the excess verbiage not applicable to this case, the trustee must prove by clear and convincing evidence that there was a transfer of an interest in property of the debtor, the transfer was for less than reasonably equivalent value, and it occurred while the debtor was insolvent.[2] It is undisputed that the transfer occurred within a year of filing the chapter 7 case. The trustee must also prove that the

---

[2](a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily–

. . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

bank is a proper party for recovery under 11 U.S.C. § 550(a).

*Transfer of Interest of Debtor in Property.*

The debtor parted with assets, the value of which included the $600,000 that went to Galva pursuant to the "Consulting Agreement." The summary of the transaction, contained in Exhibit # 8, Tab 13 ("DEAL STRUCTURE"), shows the assets transferred for cash and notes of AUS/Scharpf, with values attributable to various categories of assets. This total is further broken down into cash allocated to the $600,000 to Galva and other payments to the bank. In other words, Galva was receiving the funds, but it was for specific assets of the debtor. Because of the asset values and the hostile relationship between the parties, the money had nothing to do with services made available by Walter Nocito. Thus, the first prong of the test for constructive fraud is met.

*Reasonably Equivalent Value.*

Finding that Mr. Nocito personally received the benefit of the $600,000 paid for the debtor's assets does not necessarily compel a finding that the debtor did not receive reasonably equivalent value. Transfers, loans, and guarantees between and among affiliated entities and individuals that are not dollar for dollar exchanges may sometimes provide a collateral benefit that does not result in a constructively fraudulent transfer. *See, e.g., In re Seaway Int'l Transp., Inc.*, 341 B.R. 333 (Bankr. S.D. Fla. 2006); ("reasonably equivalent value" of transfer may be direct or indirect); *In re Gulf Northern Transp., Inc.*, 323 B.R. 786 (Bankr. M.D. Fla. 2005) (same); *In re BCP Mgmt., Inc.*, 320 B.R. 265 (Bankr. D. Del. 2005) (court must examine all aspects of a transaction to determine "reasonably equivalent value" of benefits received by the debtor). Sometimes a loan to one entity, perhaps guaranteed by another that does not receive the

14

loan proceeds, may help several related businesses, resulting in an economic benefit, albeit indirect, to all. Such a transaction is for "reasonably equivalent value" and will not be set aside by the trustee. *See, e.g., In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344 (C.D. Ill. 2006) ("synergy" within corporate group provided reasonable equivalent value); *In re National Century Fin. Enters., Inc.*, 341 B.R. 198 (Bankr. S.D. Ohio 2006) (focus is on indirect economic benefit to debtor, not third party). That did not happen here. Funds from the sale of the debtor's assets went to pay the debts of the principal, and the trade creditors were left completely out of the mix. The transfer of the $600,000 was not for "reasonably equivalent value," and the trustee has met the second prong of the test for constructive fraud.

This is not true of the $245,000 paid on the "Consulting Agreement" as a percentage of sales after closing. The dollar for dollar release of Mr. Nocito's marketable securities, which were then applied to AU's debts to Wells Fargo pursuant to Mr. Nocito's guarantee, did result in reasonably equivalent value to the debtor. This transfer cannot be avoided.

*Insolvency.*

Whether an entity is insolvent at the time of a challenged transfer under 11 U.S.C. § 548(b), or becomes insolvent as a result of the transfer, is a balance sheet determination; that is, whether the entity's debts exceed its assets. 11 U.S.C. § 101(32). Generally Accepted Accounting Principles require that inventory of finished goods and raw materials be valued at the lower of cost or market, and this issue was vigorously contested at trial. The debtor showed all of its inventory at cost and apparently did not make it a practice to write down the cost of merchandise not sold or raw materials remaining at the close of a season.

Both Mr. Nocito and Mr. Neary asserted that they believed that the liquidation of the

15

debtor's assets would be more than enough to pay all the creditors, making AU a solvent entity. Mr. Neary was credible in this regard, and he was receiving optimistic information from Mr. Nocito. Just weeks prior to the closing, Mr. Nocito provided Wells Fargo with an estimate of expected revenue from the sale of collateral resulting in possible "excess cash" of $1.15 million. Wells Fargo's expert, Tracy Coenen, reconstructed the debtor's balance sheet and testified that in her opinion following the transactions, AU had a balance sheet equity of at least $1,156,184, and as much as $1,692,682. She stated there was nothing in the corporate records to indicate that inventory should be valued at anything but cost. However, according to her mathematical calculations, the inventory could have been discounted as much as 60% to 74% and the company would still be solvent from a balance sheet standpoint.

On the other hand, the trustee's expert, David Omachinski, former CFO and COO of Oshkosh B'Gosh and now a certified public accountant in private practice, testified as to how the value of the inventory should have been written down and liquidated rather than accumulated for years as AU had done. It had been the practice of his former employer to dispose of unused fabric at about 20% of cost, and leftover completed goods at close to cost, except for certain "classic" styles. Liquidation should be done promptly at the close of the season to maximize value. Since the fabric was not current, he estimated it was worth only about 10% of cost. He believed finished garments should be written down to 40% of cost. (Ex. # 10) Mr. Nocito's, and the bank's, argument was that AU had a different type of apparel, and older styles could be brought back and sold. The fact that Mr. Nocito had made some sales of prior years' merchandise, unquantified at trial, was offered as proof of this distinction. Nevertheless, Mr. Scharpf testified he had seen sales results, and it was minimal. Furthermore, the quantity of old

16

inventory and fabric carried on AU's books shows that sales of prior years' inventory was never a lucrative solution to leftovers.

Another factor showing the need for a substantial writedown was the conditions under which prior years' inventory and fabric was kept. Whereas the factory was clean, well organized, and well maintained, the warehouse storing prior years' goods was harshly criticized by two witnesses who had been there. Messers. Scharpf and Wald said the fabric and garments were not protected, and the warehouse was dirty and infested with wildlife. Mr. Neary disagreed, noting that he observed no raccoons while he was there, but the other two witnesses are in the fabric and apparel business. They are more likely to know how such goods should be stored, and the court found them more credible and their assessment of conditions persuasive. Mr. Scharpf believed that finished goods are only salable for two or three years; after that, dry rot sets in. In a memo to the bank, he stated that everything left was two to five years old, and he testified that some items might have been as old as seven years.

The sheer magnitude of the older garment inventory, approximately 153,000 items, indicates that Mr. Nocito would be very hard pressed to recover the cost at which they were carried, even if they were offered at an attractive discount.[3] If he had presented evidence of thousands of orders, the court might have given credence to his optimistic claims, but he did not. It is also important that no manufacturing was taking place to use up the prior years' fabric, thus justifying a substantial writedown. Finally, the remaining inventory was sold to a liquidator for $197,000, which no one believed was out of line for what a liquidator pays for such materials.

---

[3] This was a major source of Mr. Scharpf's ire, as he claimed the same customers were confused about the difference between AU and AUS. However, the name "Art Unlimited" was not sold as part of the sales agreement.

17

While there is no question that liquidation brings bottom dollar, this is a far cry from the $1.8 million to $1.9 million at cost for the inventory not purchased by Mr. Scharpf. The court was therefore convinced that at the time of the transfer, raw materials and finished goods should be valued at the $1,574,512 estimated by Mr. Omachinski, not cost of approximately $3.8 million, and the company had a negative value of ($652,550). (*See* Ex. # 10) Thus, AU was insolvent at the time of the sale transaction, and the third prong of the constructive fraud test is met.

*Liability of Transferee*

This does not end the inquiry, however. We have already determined that Mr. Nocito is liable for the avoided transfer under 11 U.S.C. § 550(a)(2). Is the bank similarly liable for the same $600,000? If so, of course, only one recovery is allowed. 11 U.S.C. § 550(d).

Section 550(b) provides that the trustee may not recover an otherwise constructively fraudulent transfer from

> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
> (2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(b).

The initial transferee of the $600,000 under the "Consulting Agreement" was Galva, and the bank was an immediate transferee (if the transfer is deemed from Galva to Wells Fargo by virtue of the withdrawal from Galva's account) or a mediate transferee (if the transfer is deemed to be from Galva to Mr. Nocito to the bank for Mr. Nocito's benefit). The payment was for an antecedent debt, and Mr. Nocito's personal obligations were reduced accordingly.

Other circuits have held subsequent transferees of fraudulent transfers to higher standards

than does the Seventh Circuit with respect to how much oversight the subsequent transferee is to do with respect to an avoidable transaction. *Cf. In re Southern Indus. Banking Corp.*, 115 B.R. 930 (E.D. Tenn. 1990) (noting the majority of courts take the approach that if the entity being sued to recover the preference or fraudulent transfer is technically the "initial transferee" (for example because it was the payee of the checks at issue), but it never obtained control over the funds and acted merely as a financial intermediary, then one looks to equitable factors, such as their good faith, in deciding whether or not to hold them liable). The minority approach taken by the Seventh Circuit is to simply declare them not a transferee at all because of lack of "dominion and control." *See Bonded Fin. Servs., Inc. v. European Am.*, 838 F.2d 890 (7th Cir.1988).

The *Bonded* court refused to accord transferee status to the bank that acted merely as a financial intermediary which held the check only for the purpose of fulfilling an instruction to make the funds available to someone else. This is what Wells Fargo did when it applied the $600,000 from Galva's account as instructed. The Seventh Circuit also points out that an immediate or mediate transferee is protected by 11 U.S.C. § 550(b)(1) if it gives "value," not necessarily "value to the debtor," the term used in 11 U.S.C. § 548(c) to protect an initial transferee. The *Bonded* court recognized that "monitoring of earlier stages is impractical, and exposing them to risk on account of earlier delicts would make commerce harder to conduct." *Id.* at 897. Wells Fargo gave value when it paid down loans that were not the debtor's.

At the time of closing and the $600,000 transfer, the court is satisfied that Mr. Neary's participation in the transaction was done in good faith. The trustee argues that the bank should have discerned that AU's debt to Wells Fargo was not being reduced dollar for dollar by the amount of values assigned to the assets being transferred by the debtor. He contends that the

19

bank should not have allowed the $600,000 to be diverted to Mr. Nocito's personal obligations. Hindsight, of course, reveals that the deal was not proper, but it does not necessarily constitute lack of good faith on the part of the bank. Running the proceeds from the "Consulting Agreement" through Galva to save income taxes made good economic sense, and saving taxes meant that Mr. Nocito might be better able to work off his guarantees of AU's obligations. The court has held that the debtor was insolvent at the time of sale because much of the inventory shown at cost was worth far less, but Mr. Neary had no reason to know that when the sale took place. He thought everything looked fine, and Mr. Nocito had rosy projections of what he would realize from retained inventory. And what if Mr. Neary had refused to consent to the sale as structured by Mr. Nocito? This sale was the only game in town, the bank was receiving all the money, plus the $500,000 from the Galva loan, and its loans to various parties were still not satisfied. Mr. Neary was trying to obtain the best possible benefit for the bank, which he did. If the parties had overcome their differences to work together rather than as competitors, if Mr. Scharpf had purchased more inventory at cost, if Mr. Nocito had accepted the late offer of forty cents on the dollar for remaining inventory, or if some other positive event had occurred, trade creditors might well have benefitted. Mr. Neary's attempts to salvage the parties' business relationship after the sale were also fruitless, but it showed his attempts to obtain the greatest possible recovery of the debtor's assets and that he was not complicit in any avoidable transfer concocted by Mr. Nocito or Galva.

CONCLUSION

For the reasons stated above, the plaintiff is entitled to judgment for $600,000, plus costs, against defendants Walter L. Nocito and Galva Foundry Company, Inc. The action against

20

defendant Wells Fargo Bank Wisconsin, NA, is dismissed.  Separate orders for judgment and dismissal will be entered accordingly.

December 6, 2006

Margaret Dee. McGarity
Chief Judge, U.S. Bankruptcy Court

Case 04-02098-mdm    Doc 67    Filed 12/06/06    Page 21 of 21